GENERAL MOTORS CORP.

v.

BENDIX AVIATION CORP.

Civ. No. 1348.

United States District Court,
N. D. Indiana, South Bend Division.

June 28, 1954.

John H. Bruninga, Philip B. Polster, St. Louis, Mo., for plaintiff.

Lawrence C. Kingsland, St. Louis, Mo., M. A. Hobbs, South Bend, Ind., Gordon W. Daisley, Washington, D. C., George Beamer, South Bend, Ind., for defendants.

SWYGERT, Chief Judge.

This suit was originally filed on December 15, 1951, in the United States District Court at St. Louis, and was transferred on February 20, 1952, to this court under the provisions of Title 28 United States Code, § 1404(a). It concerns questions arising out of patent interferences. These interferences involved claims contained in applications for patents, and in issued patents, the subject-matter of which has to do with the so-called "automatic choke" on an automobile carburetor.

The Board of Interference Examiners defined the subject-matter of Interference 82,841, here involved, in its decision dated August 21, 1951, as follows:

"This interference relates to a device for automatically controlling the richness of the *mixture of fuel and air discharged* by the carburetor of an internal combustion engine in response to temperature and vacuum conditions of the engine so as to eliminate the ordinary hand choke arrangement."

The subject-matter of Interference 79,-386, also here involved, was defined by the Board of Interference Examiners in its decision dated October 31, 1945, as follows:

"This interference relates to a device for automatically controlling the richness of the *mixture discharged* by the carburetor of an internal combustion engine in response to temperature and vacuum conditions of the engine so as to eliminate the ordinary hand choke."

A chronology of some of the more important events in the numerous proceedings leading to this suit is set forth in an appendix attached hereto. For convenience, the patent applications are given alphabetical, and the interferences numerical, designations.

## I—ESTOPPEL

The Shaff application (designated A) was filed on March 13, 1930, as serial No. 435,394. The Jorgensen and Jorgensen joint application (designated B) was filed on January 8, 1932, as serial No. 585,510. Both applications A and B described control of both the air valve and the fuel valve of a carburetor.

On March 30, 1934, Interference 68,-187 (designated I) was declared between claims presented in application B and with a number of other patent applications, including Swigert which had been assigned to General Motors, and Chandler which had been assigned to Bendix. On August 14, 1934 application A was assigned to Bendix and on September 24, 1935, Bendix moved in the interference proceeding to substitute claims presented in application A, for the Chandler application. The motion was granted. On December 31, 1936, the interference was dissolved by the Patent Office Examiner on grounds of unpatentability of counts. The Board of Appeals affirmed the decision on May 21, 1937.

On September 24, 1935, three more interferences were declared: 71,471 (designated II), 71,472 (designated III), and 71,473 (designated IV). Interference

II involved claims stemming from applications A and B and the applications of four other parties. Interference III involved claims asserted in applications A and B and four other parties. Interference IV involved only claims asserted in applications A and B.

Interference II was dissolved on January 7, 1937, for unpatentability of counts. Interference III was dissolved on May 21, 1937, for unpatentability of counts. Interference IV was dissolved on October 13, 1936, on the ground that Shaff had no right to make the counts. The dissolution of the Interferences II, III, and IV was affirmed in each instance by the Board of Appeals.

On July 30, 1937, Clarence H. Jorgensen, as sole owner, agreed to assign application B to General Motors.

On August 23, 1939, Interferences 77,-410 (designated V) was declared between applications A and B on a single count. On May 8, 1940, the Primary Examiner dissolved Interference V on ground that Jorgensens were estopped for failure to bring a motion for additional claims in the earlier Interferences I to IV. This decision was affirmed by the Board of Appeals on December 23, 1940.

On December 26, 1944, patent No. 2,-365,910 issued upon the application A, to Shaff. On February 25, 1945, General Motors, as assignee of Jorgensens' application A, copied claims 11, 12, 14 to 33, inclusive, of this patent issued to Ernest H. Shaff. The Primary Examiner refused to set up another interference on the ground of estoppel. The Examiner in his decision stated:

"Applicants have already been in five interferences involving Shaff's application. * * * No reason is seen for setting up still another interference, since applicants had ample opportunity to propose an interference with Shaff on the subject matter of the claims now copied from Shaff's patent."

Jorgensens appealed the decision to the Board of Appeals, which affirmed the Examiner. On reconsideration, however,

the Board modified its decision and held that there was no estoppel except as to one of Jorgensens' claims which corresponded to Shaff's patent claim 11. The Board's reason for holding an estoppel as to this claim was that it formed an issue in Interference V and that the Board of Appeals held in that interference that Jorgensens were estopped to make this claim because of their failure to assert the claim in one of the previous Interferences I to IV. Jorgensen later brought a proceeding under R.S. § 4915, 35 U.S.C. § 63,[1] to review, among other things, the correctness of this estoppel rejection. The Court held that the ruling of the Board of Appeals was proper. Jorgensen v. Kingsland, D.C.1949, 83 F.Supp. 319. The Board's reason for modifying its ruling as to the other claims proposed by Jorgensens as counts of the interference was that Jorgensens had actually presented, in Interference I, a claim designated Proposed Count "A" in that interference substantially similar to Shaff patent claim 19 and therefore should not be estopped. As a result of this modified ruling Interference VI was declared on May 2, 1947, and claims 12, 14 to 28, 31 to 33 of the patent issued to Shaff upon application A became Counts 1 to 19 of Interference VI.

On August 21, 1951, the Board of Interference Examiners in Interference VI held Jorgensens estopped to assert priority over Shaff. The Board disagreed with the Board of Appeals' *ex parte* decision, and held that the Jorgensens' claim presented in Interference I, (designated as proposed count "A" in that interference) was substantially different than the closest corresponding count in Interference VI (Count 7) and therefore Jorgensens should not be relieved of an estoppel. Moreover, the Board of Interference Examiners held that Ernest H. Shaff was, in fact, the prior inventor of the subject-matter of the claims in dispute.

Within six months after the Board of Interference Examiners' decision, the complaint in this action was brought under Section 4915 of the Revised Statutes, 35 U.S.C. § 63, (as it existed at that time) for a decree that Jorgensens are the prior inventors of the subject-matter of the dispute of Interference VI and authorizing the Commissioner of Patents to issue to the plaintiff a patent for the subject-matter of Jorgensens' application B.

The Jorgensen sole application serial No. 15,201 (designated C) was filed on April 8, 1935, and was assigned to plaintiff on April 9, 1935. It was directed solely to an automatic control of the fuel valve of a carburetor. It was not involved in Interferences II to V. On June 9, 1938, Shaff filed an application, serial number 212,738 (designated A2) as a continuation of application A, which contained claims also solely related to the automatic control of the fuel valve. On December 17, 1940, application C issued as patent No. 2,225,261 to Jorgensen. Shaff immediately copied a number of claims of this patent into application A2. Thereupon, on May 27, 1941, Interference 79,386 (designated VII) was declared between application A2 and Jorgensen patent No. 2,225,261, issued upon application C. On October 31, 1945, the Board of Interference Examiners in this interference awarded priority to Shaff. The question of estoppel was not considered. This decision was affirmed by the Court of Custom and Patent Appeals on April 3, 1951, Jorgensen v. Shaff, 189 F.2d 264, 38 C.C.P.A., Patents, 1061, and on May 27, 1952, application A2 issued as patent No. 2,598,450 to Shaff.

In the instant action defendants filed an answer to the complaint, and also filed a counter-claim under Section 4918 of the Revised Statutes, 35 U.S.C. § 66,[2] alleging that Jorgensen patent No. 2,225,261 (C) and the Shaff patent No. 2,598,450 (A2) are interfering patents, and praying that the Jorgensen patent (C) be held void as to claims 1, 4, 5, 6, 10, 12 and 15, all of which were involved in Interference VII.

---

1. Now 35 U.S.C. §§ 145, 146.

2. Now 35 U.S.C. § 291.

The Jorgensens joint application B was involved in Interference 78,345 with an application of Otto Henning, assigned to Carter Carburetor Corporation, and in Interference 80,733, with an application of George E. Ericson, similarly assigned to Carter Carburetor. The decisions of the Board of Interference Examiners in those interferences were adverse to plaintiff. Thereupon plaintiff brought actions under R.S. § 4915 in the District Court of the United States for the Eastern District of Missouri. In those proceedings Judge Duncan entered judgments in favor of plaintiff in both actions for the reason that party Jorgensens was held to be the prior inventor, Jorgensen v. Ericson, D.C., 81 F.Supp. 614, 619 and Jorgensen v. Henning, D.C., 81 F.Supp. 621, which decisions were affirmed by the Court of Appeals for the Eighth Circuit, Ericson v. Jorgensen, 180 F.2d 180, Henning v. Jorgensen, 8 Cir., 180 F.2d 353, certiorari denied 340 U.S. 813, 71 S.Ct. 40, 95 L.Ed. 597.

The instant case proceeded to trial on testimony in open court, on certain of the depositions and exhibits offered before the patent office in Interferences VI and VII and other evidence. Plaintiff introduced the oral testimony of Clarence H. Jorgensen, Clyde R. Paton, Thomas B. Chase and Walter Edwin Lay. Plaintiff also offered the depositions of Howard N. Kyser and of Gilbert D. Williams in Interference VI, and the depositions of L. V. Morris Gray, Kenneth H. Milne, Mrs. Leonore F. Jorgensen and Fred E. Aseltine in Interferences VI and VII. The testimony of Clyde R. Paton and of Gilbert D. Williams had not been offered in Interference VII, but their depositions were offered in Interference VI. Clarence H. Jorgensen, Clyde R. Paton, Howard N. Kyser and Gilbert D. Williams testified in court before the District Court in Jorgensen v. Ericson. Thomas B. Chase did not testify in Interferences VI and VII, nor before the District Court in St. Louis. Walter Edwin Lay did not testify in Interferences VI and VII.

Defendants contend that during the motion periods of Interferences I to V plaintiff, along with the Jorgensens, had access to the Shaff application A and thus had constructive knowledge that claims corresponding to counts 1, 3 and 4 of Interference VI had been indicated by the Primary Examiner on August 23, 1935, to be allowable to Shaff. Their contention is that during these previous interferences neither plaintiff nor its assignor, the Jorgensens, moved under Rule 109 of the Patent Office [3] to bring into the interferences the allowable Shaff claims or any other claims relating to the subject matter which later formed the counts in Interference VI.

Defendants further contend that beginning on August 6, 1941, the day on which preliminary statements in Interference VII were approved, plaintiff and Jorgensen had access to Shaff application A as the parent of continuation application A₂. That during the motion period of Interference VII the aforementioned claims which later became counts 1, 3 and 4 of Interference VI stood allowed in application A and that during that period application A also showed that claims corresponding to counts 6, 7, 8, 9 and 10 of Interference VI had been indicated by the Primary Examiner on August 18, 1941 to be allowable; that plaintiff and Jorgensen had knowledge during the motion period of Interference VII that Shaff was claiming to be the inventor of the subject matter of these claims and should have requested during this period an interference between applications A and B.

With reference to Interference VII and the patents issued upon application A₂ and C, defendants say plaintiff is estopped to contest priority because plaintiff failed to request under Rule 109 an interference between applications A and C during the motion periods of Interferences I to V. During this time claims 1, 2 and 3 of the Shaff patent issued upon application A₂ stood allowed in application A. These claims were directed to the fuel valve control subject-mat-

---

3. Now Patent Office Practice Rules, rule 233, 35 U.S.C.A.Appendix.

ter involved in Interference VII. Therefore, defendants assert, since plaintiff had constructive knowledge of at least three claims covering substantially the same subject-matter as counts in Interference VII during Interferences I to V, and since no interference was requested by plaintiff during these interferences on the subject-matter of these claims, it is estopped to deny presumptive priority to Shaff with respect to the counts in question.

In short, defendants claim that failure of the plaintiff and Jorgensens to move under Rule 109 to amend applications B and C during Interferences I to V to include claims which later became counts in Interferences VI and VII estops plaintiff from now asserting priority of invention of the subject-matter of the claims which were in dispute in these last two interferences.

The aforementioned Rule 109 provided in part:

"109. An applicant involved in an interference may, * * * on motion duly made as provided by rule 153, file an amendment to his application containing any claims which in his opinion should be made the basis of interference between himself and any of the other parties. * * *

"Any party to an interference may bring a motion to put in interference any claims already in his application or patent which should be made the basis of interference between himself and any of the other parties. Any party to an interference may bring a motion * * * to include an application or a patent owned by him, as to claims which should be made the basis of interference between himself and any of the other parties. * * *"

In its decision in Interference VI the Board of Interference Examiners explained the doctrine of estoppel under Rule 109 as follows:

"The proposition involved is an estoppel for failure to propose un-

der the provisions of (old) Rule 109 a count defining certain patentable subject matter disclosed by the senior party. There is a duty upon the junior party, arising out of the provision of (old) Rule 116 (as amended effective August 21, 1934), to bring into issue any subject matter disclosed in common with the senior party by presenting claims during the motion period, subject to determination of patentability thereof if not already patented, upon which he desires to contest priority, and the junior party will be held to be estopped if he attempts to present claims to such matter for a second interference with such senior party. In re Austin 1930, C.D. 505, 509–10. The purpose of the rule is (insofar as the parties interferant are concerned) to protect the party who is the prima facie first inventor of the subject matter by reason of his first constructive reduction to practice from the expense and trouble of multiple interferences and from the possible unequal detrimental effects of the ravages of time upon his witnesses. The rule and the condition under which it applies have been thoroughly considered and fully discussed in Avery v. Chase, 1939 [101 F.2d 205] 26 C.C.P.A. [Patents] 823; and in opinions in cases referred to in that opinion. It is clear that the rule applies whether other parties were present in the interference or not, in the present case there were prior interferences of both kinds. The rule applies even if the prior interference had been dissolved on the ground that the count was unpatentable. In re Brashares, 1935 [74 F. 2d 751] 22 C.C.P.A. [Patents] 873. The rule applies even if no claim to the subject matter stood in the senior party's application file during the pendency of the prior interference."

Three forms of estoppel have apparently been considered by the courts in

patent interferences. One is estoppel by judgment, or *res judicata;* another is estoppel *in pais,* or equitable estoppel; and the third is a doctrine of estoppel for failure to comply with Rule 109 as that rule has been interpreted.

In Blackford v. Wilder, 1907, 28 App. D.C. 535 the District of Columbia Appellate Court stated that the principles of *res judicata* were appropriate to patent interference proceedings and held that where an interference had terminated in a decision of priority, the defeated party could not prosecute broader claims covering the same subject-matter in a second interference. From that start there has developed in the decisions the other doctrines of estoppel, first, one of an equitable nature and then one more broadly, upon the theory that an applicant's mere failure to move under Rule 109 creates an estoppel regardless of whether there is a basis for the application of *res judicata.* This latter doctrine of procedural estoppel is the rationale of the decision in Avery v. Chase, 1939, 101 F.2d 205, 212, 26 C.C. P.A., Patents, 823, which the Board of Interference Examiners followed in Interference VI.

In the Avery case the Court of Custom and Patent Appeals reviewed its prior decisions and concluded that Rule 109, as well as the other Rules of Practice, must be binding upon the Patent Office as well as the applicants in order to avoid an "intolerable situation of confusion". The Court held the applicant estopped on the ground of failure to proceed under Rule 109 within the proper time. It is obvious that the estoppel there applied was not based on *res judicata* because the issue in dispute could not have been settled in the first interference. The Court noted that the Court of Appeals for the District of Columbia in International Cellucotton v. Coe, 1936, 66 App.D.C. 248, 85 F.2d 869, had expressly stated that only *res judicata* principles are applicable under Rule 109, but indicated that it felt constrained to take a different view.

In the Cellucotton case, the Court of Appeals stated that an estoppel arising out of a failure to move under Rule 109 could be sanctioned only where the doctrine of *res judicata* was applicable and held *res judicata* inapplicable when claims sought as counts of the second interference could not have been made issues of the first interference, as the subject matter of the disputed claims had not been disclosed in the first interference. This principle was reasserted by the Court of Appeals for the District of Columbia in American Cyanamid Co. v. Coe, 1939, 70 App.D.C. 330, 106 F.2d 851.

A vigorous dissent by Judge Bland in the Avery case points out that Rule 109 is only permissive in its wording, and that the Patent Office has made no rule which states that a party will be denied claims if he does not take advantage of the invitation extended by Rule 109. In a later decision, Judge Galston in News Projection Corporation v. Western Union Telegraph Co., D.C.S.D.N.Y.1941, 38 F.Supp. 854, 857, agreed with Judge Bland that Rule 109 was not mandatory and that "there is no statutory bar created in [its] terms."

I am of the opinion that the sounder view is that expressed in the Cellucotton and News Projection cases, which hold for a more constrictive estoppel doctrine than that pronounced in the Avery case. As Judge Bland in the latter case points out in his dissent, the mandatory estoppel doctrine of Rule 109 is merely a creature of administrative authority. It is not contained in any of the rules promulgated by the Patent Office.

The principles of *res judicata* cannot be extended so as to produce an estoppel in this cause. In Interferences I to V no decision on the merits was rendered; instead all of these interferences were terminated by interlocutory motions which were not appealable to any court. See Gyro-Process Co. v. Coe, 1939, 70 App.D.C. 390, 107 F.2d 195. A dissolution of an interference is not a final

judgment of priority; therefore *res judicata* is inapplicable. Parker v. Craft, 1919, 49 App.D.C. 88, 258 F. 988.

█ A different problem arises as to the application of the doctrine of estoppel based on *res judicata* with respect to Interference VII. Since that interference did terminate in a decision as to priority the question is presented whether plaintiff and Jorgensens were estopped in Interference VI from presenting claims which, though not counts in Interference VII, were nevertheless disclosed in the applications to which they had access during that interference and which were later incorporated as counts in Interference VI.

As stated earlier, defendants urge that since Jorgensens, before and during the motion period in VII knew that Shaff's claims corresponding to counts 1, 3 and 4 of Interference VI stood allowed; and claims corresponding to counts 6, 7, 8, 9 and 10 of that interference had been indicated by the Primary Examiner to be allowable, Jorgensens should be estopped in Interference VI from asserting these claims.

One of the essential prerequisite requirements for *res judicata* application was noted in the leading case of Blackford v. Wilder, supra, in the following language:

"Applying the well-settled principle of estoppel by judgment, before stated, it follows inevitably that the final decision in the first interference is conclusive, unless it can be made to appear that the question upon which the determination of the second case rests is one that neither was, *nor could have been, presented and determined* in the first case."

The Cellucotton and Cyanamid decisions also emphasized that if the claims in question could not have been made part of the first interference by motion that *res judicata* is not applicable. In order to determine whether the claims and counts here in question could have been raised in Interference VII, Rule 94 of the Patent Office [4] rules should be considered. Rule 94 states that:

"Interferences will be declared between applications by different parties for patent or for reissue when such applications contain claims for substantially the *same invention* which are allowable in the application of each party, and interferences will also be declared between applications for patent * * * of different parties, when such applications and patents contain claims for substantially the *same invention* which are allowable in all of the applications involved * * *." (Emphasis supplied.)

This Rule clearly indicates that an interference is properly declared only when two parties claim the same patentable subject-matter.

The fact that Shaff may have disclosed in the parent application A more than he claimed in application $A_2$ would not have been grounds for the Interference Examiner to have added, as counts of Interference VII, Jorgensens' disclosed, but not claimed, invention even if Jorgensen had made such a motion to amend. Instead the Examiner would have had to declare a second interference for the claims involving the unclaimed but disclosed subject-matter of Shaff.

The Patent Office issued patent No. 15,201 to Jorgensen on claims arising from application C. The subject-matter of this application was involved in Interference VII, for the interference was declared when Shaff copied the claims contained in this patent. Interference VI, however, was declared when Jorgensens copied the claims contained in patent No. 2,365,910 issued to Shaff on basis of claims in application A. This court must accept the view that the Patent Office issued two different patents to two different parties on two different applications on the basis that it thought that two different inventions were involved. That Shaff considered two distinct inventions were involved and that only one invention was claimed in appli-

---

4. Now Patent Office Practice Rules, rule 201, 35 U.S.C.A.Appendix.

cation A₂ is indicated by a letter written by his attorney to the Patent Office on June 17, 1938. Concerning application A₂ the letter stated:

"The above entitled application was filed for the purpose of avoiding any possibility of double patenting as between applicant's co-pending applications Serial Nos. 435,394 filed March 13, 1930, and 750,758 filed October 31, 1934. Both of said applications contain claims directed to the control of fuel flow by suction control and/or temperature, and the line of division between the claims of the respective applications is difficult to establish and maintain. The present application therefore embraces all of the claims of both of the previously filed applications which relate to fuel control, and it embraces that part of the disclosure of the previously filed application which supports fuel control claims."

It is apparent that Jorgensens were under no duty to bring forward the claims later presented in Interference VI since they could not properly have been made the basis of an interference in Interference VII, the counts of which dealt only with control of a fuel valve.

Claims 23 and 24 of Shaff patent 2,-365,910, corresponding to counts 11 and 12 of Interference VI, were copied by Shaff from claims 1 and 7 of a Sisson patent No. 2,309,419 dated January 26, 1943, within one year of the issue date of said patent, and an interference was declared between Shaff and Sisson. Priority of invention as to the subject-matter of these two claims was awarded to Shaff. Corresponding claims were first presented in application B subsequent to issuance of Shaff patent 2,365,910 on December 26, 1944, nearly two years after the date of issue of Sisson patent 2,309,-419. The Board of Interference Examiners held in VI that the party Jorgensens was barred by the delay in presenting the claims from contesting priority on that issue under the provisions of 35 U.S.C. § 51 (1951).[5] The Board held

that the defense is available to a party who, in a seasonably instituted interference, wins an award of priority over the first patentee as to such claims, De Ferranti v. Harmatta, 1921, 50 App.D.C. 393, 273 Fed. 357, and that the bar runs from the date of the first patent granted having the claims in it. Ibid; Jorgensen v. Kingsland, D.C.1949, 83 F.Supp. 319.

Plaintiff relies on the limitation enunciated in Jenks v. Knight, 1937, 90 F.2d 654, 657–660, 24 C.C.P.A., Patents, 1227, to avert the application of the estoppel bar under the provisions of 35 U.S.C. § 51. There the court stated:

"It will be observed that there an exception was made to the two-year rule [now one year]. This was because of the fact that during all the time Chapman's application was pending, Beede was claiming the invention, that the issuance of the patent to Chapman was clearly an inadvertence, and that there was no delay on the part of Beede in claiming the invention since he had been claiming it from the beginning.
\* \* \*

" 'A comparison of claims 1–5 of the Knight patent with the counts in issue shows very clearly that the two sets of claims are drawn to the same subject matter and invention. While the counts in issue are worded in somewhat broader terms than the claims of Knight it is evident that both the Jenks and Knight Patents claim substantially the same invention. \* \* \*'

" \* \* \* While the language of the involved counts and that of the canceled and allowed claims differ somewhat, we are not convinced that the tribunals of the Patent Office were in error in holding that all of said claims were substantially for the same invention. It seems to us that the difference between them is more in the form of expression than in the inventive subject-matter covered."

Similarly, see Cryns v. Musher, 1947, 161 F.2d 217, 34 C.C.P.A., Patents 963, and

---

5. Now 35 U.S.C. §§ 132, 135.

Thompson v. Hamilton, 1946, 152 F.2d 994, 997, 33 C.C.P.A., Patents, 732.

The Sisson patent No. 2,309,419 was issued on the subject-matter disclosed in, and claims contained in, application serial No. 567,817, filed October 9, 1931. Claims from the Sisson application were involved in Interference I with Jorgensens' application B and later Shaff application A. Jorgensens' application B and Sisson's application, among others, were also in Interferences 68,188, 68,189, 68,-190 and 68,191. Sisson's application, Shaff application A and Jorgensens' application B were also involved in Interferences II and III.

A comparison of the counts of the aforementioned interferences with the claims in Sisson's patent and claims in Jorgensens' application B manifests that both these parties were making claims relating "substantially to the same invention." It follows that no statutory bar can be applied against Jorgensens stemming from the claims copied by Shaff from the Sisson patent and re-copied by Jorgensens into its application, since Jorgensens had already at an earlier date, prior to the date when the Sisson patent issued, made substantially similar claims in its application B.

## II—PRIORITY

As early as 1912 Peter Jorgensen and his son, Clarence H. Jorgensen began experimenting with and constructing priming devices for automobile carburetors. In 1921, they were issued a patent for a gasoline injector to facilitate starting, and in 1925, another patent for a semi-automatic choke. In 1927, the Jorgensens developed for use on a Buick automobile owned by Clarence H. Jorgensen an automatic choke device. This device was subsequently lost. It had some of the features and was the forerunner of the structure disclosed in Jorgensens' patent application filed January 8, 1932.

The first time this device, plaintiff's Exhibit 13, was used was late in 1928 on a Studebaker automobile Jorgensen had purchased direct from the factory at a discount in order to try out his automatic choke. At that time a Schebler carburetor was on the car and the automatic choke device controlled both the fuel and air valves. Thereafter, Studebaker started using Stromberg carburetors on their 1929 car models and in the latter part of that year Jorgensen obtained from Howard M. Kyser, Service Engineer for Studebaker, a Stromberg carburetor, which Jorgensen installed on his car and to which he attached the automatic choke device. The device controlled only the air valve on this carburetor. Jorgensen continued to use the device on the car in connection with the Stromberg carburetor until sometime in 1930, when he turned the car over to his employer, the Dole Valve Company.

The principle questions on priority are: (1) Was plaintiff's Exhibit 13, which Jorgensen claims to be the original device, used on the Studebaker car during 1928–30, that is, before the filing date of Shaff's application, March 13, 1930, on which date the defendants rest their case as to priority; and (2) if this device was so used, did it operate with sufficient success to constitute a reduction to practice.

It is not deemed necessary to recount a lengthy résumé of the evidence presented by plaintiff relating to conception and prior reduction to practice. Most of the evidence presented by the Jorgensens relating to the alleged prior reduction to practice is fully set out in the Court of Customs and Patent Appeals decision in Jorgensen v. Shaff, 1951, 189 F.2d 264, 38 C.C.P.A., Patents, 1061, and in the Board of Interference Examiners' decision rendered in Interference VII on October 31, 1945, and in Judge Duncan's opinion in Jorgensen v. Ericson, D.C.Mo. 1949, 81 F.Supp. 614, and the appeal therefrom in Ericson v. Jorgensen, 8 Cir., 1950, 180 F.2d 180, and by the decision of the Board of Interference Examiners in Interference VI. Moreover, specific findings are being entered herein which are supplementary to those stated in this opinion.

■ Although actions under R.S. § 4915 are *de novo* proceedings, the decision of the Patent Office with respect to priority of inventions in Interference VI

"must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction", and that such a decision may not be set aside unless the evidence produces "a clear conviction that the patent office made a mistake". Morgan v. Daniels, 153 U.S. 120, 125, 129, 14 S.Ct. 772, 38 L.Ed. 657.

The rule of the Morgan decision commands that Jorgensens carry the burden of proof of "thorough conviction" that they conceived and reduced to practice the device which is the subject matter of the interferences and of this suit. Globe Union, Inc. v. Chicago Telephone Supply Co., 7 Cir., 1939, 103 F.2d 722.

The rule of comity is applicable to the decisions of the District Court and the Court of Appeals in Jorgensen v. Ericson, supra. Apparently there is no dispute that there the actions grew out of patent office interferences involving claims to carburetor controlling devices wherein the same device as that here in evidence was relied upon by plaintiff as a reduction to practice of the interfering claims. The Supreme Court has stated that "comity persuades; but it does not command. It declares, not how a case shall be decided, but how it may with propriety be decided." Mast, Foos & Co. v. Stover Manufacturing Co., 177 U.S. 485, 488, 20 S.Ct. 708, 710, 44 L.Ed. 856. The Supreme Court continued 177 U.S. at pages 488–489, 20 S.Ct. at page 710:

> "It is only in cases where, in his own mind, there may be a doubt as to the soundness of his views that comity comes in play and suggests a uniformity of ruling to avoid confusion, until a higher court has settled the law. It demands of no one that he shall abdicate his individual judgment, but only that deference shall be paid to the judgments of other co-ordinate tribunals."

The rule of comity urges that if at the close of the proceedings the court is in doubt, it should follow the conclusions reached by another tribunal on the same facts.

In order to conclude that the Jorgensens did not develop and test the automatic choke device which is plaintiff's Exhibit 13, or one substantially identical, I would have to decide either that Jorgensen and Kyser, Paton, Williams and Chase, who corroborated Jorgensen on many material points, testified falsely or that their recollections cannot be trusted after a lapse of fifteen to twenty years. Neither determination is justified upon considering the credibility of the witnesses and after weighing their testimony as a whole. While it is true that only Jorgensen testified positively and without qualification that plaintiff's Exhibit 13 was the original device constructed by him and his father, the testimony of these other witnesses is thoroughly convincing that either *this* device or one *substantially like* it was in use during the period from late 1928 to 1930. Defendants concede that Kyser, Paton and Williams "must have seen something and that something must have had * * * in it a bellows and a thermostat;" however, they do not admit plaintiff's Exhibit 13 is the original device.

As their strongest point, defendants contend that the evidence does not carry a thorough conviction that there was sufficient testing and that there was not enough corroboration of Jorgensen's testimony relating to testing that was done, to show a reduction to practice of the Jorgensen device prior to March 13, 1930. It is true that the device was not tested under *all* weather conditions, or on *all* makes of carburetors but according to Jorgensen it was in use on the Studebaker car from late in 1928 to sometime in 1930. The above mentioned witnesses saw it on the car at various times and at some of these times the weather was cold and snow was on the ground. The general impression gained from this corroborating testimony is that at the times they were present when the car was started, the automatic choke device attached to the carburetor and manifold operated successfully. However, this tes-

timony is somewhat fragmentary, and if this were all the corroborative evidence to Jorgensen's testimony that the device operated successfully as an automatic choke throughout this period, the question before the court might be difficult to resolve. There is, however, other corroborative evidence which, when considered with the testimony of the witnesses covering the period 1928–1930, carries thorough conviction that there was a reduction to practice of the Jorgensen device prior to the date of Shaff's application. This other evidence relates to *inter partes* tests and demonstrations in 1943–1944 during Interference VII wherein a 1928 Studebaker car like Jorgensen purchased in October, 1928, was equipped with the same kind of Schebler carburetor and manifold and connected with plaintiff's Exhibit 13. In reference to these demonstrations the Board of Interference Examiners in its decision on October 31, 1945, said: "During the taking of testimony the control device was used in connection with a Schebler carburetor at recorded temperatures of from 6° to 50° F. with apparent satisfactory results."

While it is true that the law recognizes no such thing as a reduction to practice *nunc pro tunc*, Smith v. Warnock, 1921, 50 App.D.C. 326, 271 F. 556, these 1943–1944 tests do corroborate and supplement the evidence relating to a reduction to practice in 1928–1929. As before indicated, testimony of Jorgensen, corroborated in many particulars by Kyser, Paton, Williams and Chase, renders it clear and convincing that plaintiff's Exhibit 13 or one substantially like it was used on the Studebaker car during the 1928–1930 period. The 1943–1944 tests corroborate the testimony of these witnesses as to the *quality* of the tests made during the earlier period; that is, that the device operated with sufficient success to constitute a reduction to practice.

Finally, I am in substantial agreement with the conclusion reached by Judge Duncan in Jorgensen v. Ericson, D.C., 81 F.Supp. 614, 621, where he stated:

"Defendant has no evidence to disprove the evidence of the plaintiffs except that time must have dimmed the memory of the witnesses and that their testimony should not be believed, and that it falls short of being convincing in that degree required by the law.

"As heretofore stated, all of the witnesses were engaged in the automobile industry and interested in its development. They were men of experience in their field and their integrity is unquestioned except to the extent that their memories could not be expected to retain the facts so long a time. While the demonstration before the Patent Office hearing of itself may not be conclusive as to the success and reduction to practice of the device in 1928 or 1929, certainly it is strong and persuasive evidence of its effectiveness while it was being tested in 1928 and 1929. This evidence, connected with the other evidence as to its use, is convincing.

"Defendant contends that taking plaintiffs' evidence as true it still does not meet the requirements of the law. With this contention I cannot agree. A careful weighing of all the evidence which was presented to the Board of Interference Examiners and which has been submitted to this court carries that thorough conviction which is required by the law, that is, that plaintiffs conceived and reduced to practice their patent in 1928 and 1929 prior to the filing of defendant's application. As heretofore suggested, plaintiffs' reason for not having filed their application for a patent until 1932 seems to the court to be without merit. Plaintiffs having reduced their patent to practice laid it aside and did nothing further about it until after the filing of defendant's application. Were it not for the fact that under the law the plaintiffs once having reduced their patent to practicable application are not required

to be diligent in filing an application, I should not hesitate to hold that the plaintiffs were lacking in diligence in the filing of their application; but that seems to make no difference and the court bows to superior judicial authority."

The Court of Appeals approved of Judge Duncan's decision by stating in Ericson v. Jorgensen, 8 Cir., 180 F.2d 180, 183:

"We think the evidence that the Jorgensens made their automatic choke device and attached it to their Studebaker car with Stromberg carburetor and tested it out and found that it worked satisfactorily through the winter of 1929 and 1930 fulfills the requirement set forth in the opinion of this court in Larson v. Crowther, 26 F.2d 780, 785, and 'carries thorough conviction' that they conceived their device and reduced it to practice at that time and prior to the application date of Ericson on November 6, 1931. * * *

"But consideration of all contentions made for appellants on the evidence has not persuaded that any facts or circumstances were shown sufficient to raise substantial doubts of the truth of the proof presented that Jorgensens did conceive and made the device they brought into court; that they attached it to a Stromberg carburetor on a Studebaker car sometime before Christmas 1929, and ran the car with it through the winter of 1929–1930. That during that time they demonstrated the device and its operation to witnesses who were especially qualified to and did understand and appraise it and that it worked successfully."

The defendants further urge that the installation of plaintiff's Exhibit 13 on the Schebler carburetor did not embody the invention defined in a number of the claims of the Jorgensen application B and which became some of the counts of Interference VI. In other words, defendants say that the combination of plaintiff's Exhibit 13 and a Schebler carburetor did not constitute a reduction to practice as respects any of the counts 2–5, 8, 9, and 13–19, because the evidence fails to show that the thermostat of the device "actually controlled or influenced the operation of the air valve of the Schebler carburetor."

The Board of Interference Examiners in Interference VI analyzed the mechanical aspects of this question in relation to the evidence and came to the conclusion that it was "not convinced that the showing made in respect to JX13 (plaintiff's Exhibit 13) with the Schebler carburetor meets the requirements of proof of reduction to practice."

If it were necessary to decide this question on this particular basis, I would have to say that I have no thorough conviction that such determination is wrong, despite plaintiff's evidence and arguments to the contrary. But defendants overlook two things: (1) the installation of plaintiff's Exhibit 13 on the Stromberg carburetor did embody the invention described in the above mentioned counts—the only control on the carburetor was the air valve—and (2) the application of the doctrine of equivalents.

In their respective original applications A and B both Shaff and Jorgensens considered the control, whether of an air valve or of a fuel valve, full equivalents. Jorgensen and his witnesses, Kyser, and Lay, the latter an expert on carburetors, testified that the principle of operation, whether the inventive device controls the air valve or the fuel valve, is the same. The witness Lay explained it as follows:

"Choking on automobiles is gotten to be a term which indicates some means for giving a very rich mixture for starting. Now we can get a richer mixture in two ways, either by reducing the air that is coming in, or by increasing the fuel flow."

Shaff testified to the same effect, albeit in metaphorical terms:

"Q. And the two were just two different ways of doing the same thing? A. That's right.

"Q. In other words, you could choke a man to death by either holding his

mouth shut or giving him a lot of gas and you suffocate him in either case, don't you? A. Yes."

Finally, in Smith v. Carter Carburetor, 3 Cir., 130 F.2d 555, 559 where the court was considering applications for patents for an invention similar to the one here involved, it was said:

"The claims of the patent are to be read in the light of the disclosure of the specifications, not to restrict the invention to the precise structure disclosed, but in order to grasp the *principle of the invention* so as to measure properly the range of equivalents. Flowers v. Magor Car Corp., 3 Cir., 65 F.2d 657, 658; 2 Walker § 261. * * * It would seem that Smith's structure, which utilized engine temperature and suction in controlling the air flow to the mixture chamber rather than the *fuel flow,* comes within the range of equivalents of the Ericson invention." [Emphasis added.]

Having determined that plaintiff is not estopped to prosecute the Jorgensens' application A and that it is entitled to priority over Shaff, the question of patentability of the invention arises. It has been said:

"Only if he [applicant] wins on priority may he proceed. In that event, the statute says, the court may proceed to 'adjudge that such applicant is entitled, according to law, to receive a patent for his invention * * *.' So adjudging, it may authorize issuance of the patent. But judicial authorization of issuance implies judicial sanction of patentability and for this reason this Court has said, 'It necessarily follows that no adjudication can be made in favor of the applicant, unless the alleged invention for which a patent is sought is a patentable invention.' Hill v. Wooster, 132 U.S. 693, 698, 10 S.Ct. 228, 230, 33 L.Ed. 502. The principle of the Hill case is that the court must decide whether claims show patentable inventions before authorizing the Commission-

er to issue a patent." Sanford v. Kepner, 344 U.S. 13, 15, 73 S.Ct. 75, 76, 97 L.Ed. 12.

The Patent Office has already issued what must now be held to be two interfering Shaff patents to the Jorgensens' original application for an invention and also a patent to Jorgensen for that part of his invention with respect to the control of the fuel valve. These prior determinations by the Patent Office as to the patentability of the invention here involved and the absence of conflicting evidence are persuasive that the Jorgensens' joint application discloses an operative inventive device that is patentable.

### III—PUBLIC USE

The defendants contend that in the event the Court should conclude that the Jorgensens were the prior inventors of the subject-matter claimed in the counts of Interferences VI and VII by reason of reduction to practice during the 1928–1929 period, plaintiff is barred under R.S. § 4886, 35 U.S.C. § 31 (1951)[4] from obtaining valid claims to such subject-matter because the demonstrations to various members of the public of their automatic choke device, as a successfully completed invention, in 1928 and 1929 was a public use within the meaning of the statute, occurring more than two years before the filing date of Jorgensen applications.

The courts have interpreted R.S. § 4886 to be limited by the 'experimental use' doctrine, that is, "if it can be made to appear that such installation and use was for experimental purposes only—to perfect the device, or to demonstrate its utility—the two-year period does not begin to run until the experimentation ceases, and the device is perfected or its utility so demonstrated. (Citing cases.)" Cline Electric Mfg. Co. v. Kohler, 7 Cir., 1928, 27 F.2d 638, 641; Elizabeth v. Pavement Co., 1877, 97 U.S. 126, 134–135, 24 L.Ed. 1000; W-R Co. v. Sova, 6 Cir., 1939, 106 F.2d 478, 481–482; Electric Storage Battery Co. v. Shimadzu, 1939, 307 U.S. 5, 20, 613, 616, 59 S.Ct. 675, 83 L.Ed. 1071.

4. Now 35 U.S.C. §§ 101, 102.

Defendants argue that the language of the courts stating that an experimental use of a devise is not a public use within the meaning of R.S. § 4886 is directed to experimentation or testing which is *incident to a subsequent* reduction to practice, and does not mean that after an invention *has been completed* by an actual reduction to practice based on such experimentation or testing, the inventor is free to continue use of the experimental device without running afoul of the public use provision of the statute.

Jorgensen testified that the original choke controlling mechanism was applied to a Shebler carburetor and used on Jorgensens' Studebaker car from before Christmas, 1928, to about Christmas, 1929. It was a handmade structure, and Jorgensen noted, "it was definitely an experimental device." Thereafter, this choke was used on a car equipped with a Stromberg carburetor. Jorgenson said that his desire was to interest other engineers and prospective buyers in the mechanism and for that purpose he demonstrated its operation to some of them, though during all this time, he asserted, "development work" was continuing on the choke. He stated that, "we were studying everything we could learn about the requirements and any features that might be desirable, so as to try and come up with a practical commercial choke," and this work continued until late in 1930. The Jorgensens' joint application was filed January 8, 1932.

Witness Paton testified with reference to the choke controlling mechanism of the Jorgensens that it was an "experimental development" and could not be considered a "commercial device."

The courts have observed that there is a great deal of difference between the requirements of a reduction to practice and the requirements made in the automobile industry for a commercially practical device, Thompson v. Murray, 1936, 84 F.2d 202, 23 C.C.P.A., Patents, 1281, and that experiments may continue in an attempt to further perfect the device beyond the requirements of a reduction to practice. Ibid. It was stated in Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 1937, 92 F.2d 330, 336 :

"So long as use by the inventor can fairly be considered experimental and collateral to the development of the invention in its complete form, the bar of the statute does begin to run. Reo Motor Car Co. v. Gear Grinding Mach. Co., 6 Cir., 42 F.2d 965, 968. The emphasis that is laid upon Gulick's use of a car with experimental pistons for business and pleasure for a considerable period does not impress us. Road tests of many thousands of miles are considered necessary to determine the efficiency of an engine and its parts. That such transportation is not wasted does not of itself constitute a public use."

There is no inconsistency in the fact that even though Jorgensens successfully reduced to practice the automatic choke in question, they continued to experiment with it in the hope of "demonstrating its utility." Therefore, it is concluded that the plaintiff is not barred because of any public use of the invention within the meaning of R.S. § 4886.

It is also concluded by reason of the determination reached in the foregoing paragraphs that the Commissioner of Patents should be authorized to issue a patent for the subject-matter of the claims, corresponding to the counts in Interference VI of Jorgensens' application 585,510.

### IV—R.S. § 4915 and R.S. § 4918

In plaintiff's supplement to its complaint filed July 3, 1953, a prayer is made for a decree adjudging that Shaff patent 2,365,910 is void, inoperative and invalid as to claims 12, 14 through 28, 31, 32 and 33, because party Jorgensens was the first inventor of the subject-matter and because neither the Shaff application A, nor the patent issued thereon, disclosed the subject-matter of said claim. In a later amendment filed on January 22, 1953, plaintiff alleged that Shaff patent 2,365,910 is void, particularly as to claims 11, 12, 14 and 21, inclusive, 31, 32 and 33 because of the subject-matter of said patent was broadened by defendants as against adverse rights acquired by plaintiff.

Defendants oppose the relief requested by plaintiff for the reason *inter alia,* that plaintiff is not entitled to inject into this R.S. § 4915 proceeding a collateral attack on the validity of defendant's patent. It should be noted that this particular issue involves only that part of the present action which is represented by the complaint, the R.S. § 4915 phase stemming from Interference VI.

The relief provided for in R.S. § 4915 is as follows:

"* * * and the court * * may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear. And such adjudication, * * * shall authorize the Commissioner to issue such patent on the applicant filing in the Patent-Office a copy of the adjudication, and otherwise complying with the requirements of law."

The Supreme Court, in the recent case of Sanford v. Kepner, supra, noted with respect to this aspect of a R.S. § 4915 proceeding:

"The principle of the Hill case is that the court must decide whether claims show patentable inventions before authorizing the Commissioner to issue a patent. No part of its holding or wording nor of that in Hoover Co. v. Coe, 325 U.S. 79, 65 S.Ct. 955, 89 L.Ed. 1488, requires us to say R.S. § 4915 compels a district court to adjudicate patentability * * * of one whose claim is found to be groundless." [344 U.S. 13, 73 S.Ct. 76.]

R.S. § 4915 permits a court, if an applicant prevails on the priority issue, to authorize the Patent Office to grant a patent to the successful applicant. It does not permit a plaintiff to use an R.S. § 4915 action to invalidate or revoke a patent granted at a prior time to the defendants by the Patent Office. See Smith v. Carter Carburetor Corporation, 3 Cir., 1942, 130 F.2d 555, 560. The Court has concluded in Interference VI that party Jorgensens was the first inventor. Though a ruling concerning the validity of Shaff patent 2,365,910(A) might be desirable as dispositive of a litigated issue, the Court cannot properly in this action enter a decree specifically declaring that patent invalid.

There can be no doubt that the Court has the authority under R.S. § 4918, 35 U.S.C. § 66 (1951) to declare "either or both" Shaff patent 2,598,450 (A₂) and Jorgensen patent 2,225,261(C) 'void in whole or in part, upon any ground, or inoperative, or invalid * * * according to the interest of the parties in the patent or the invention patented", since these are interfering patents to the same invention. On the ground of priority of invention, the Court has determined that Jorgensen was the first inventor of the common subject matter of these patents. Accordingly, the Shaff patent 2,598,450 (A₂) and the pertinent claims therein may, and should under the statutory provisions of R.S. § 4918, be declared invalid.

Plaintiff has repeatedly demonstrated that the control of a fuel valve and the control of an air valve of a carburetor by the temperature and suction responsive device here in issue are equivalent means, that one performs the function of enriching the mixture in substantially the same manner as the other. Furthermore, the Jorgensen joint application and the claims presented in it are broad enough to encompass both of these means. Therefore the question arises: Why should there be two patents covering the same invention?

During the argument plaintiff's counsel admitted this overlapping and not only argued that both Shaff patents should be declared invalid because of lack of priority, inoperativeness and other reasons, but indicated that the Jorgensen patent issued upon application C should be declared invalid because of overlapping. R.S. § 4918 permits the court to declare either or both interfering patents void or invalid. It would seem that this is a situation, which requires both the Shaff patent issued upon application A₂ and the Jorgensen patent to be declared invalid and void. This is the determination of the Court.

## APPENDIX A

| DATE | SHAFF APPLICATION | INTERFERENCES | JORGENSENS APPLICATION |
|---|---|---|---|
| Mar. 13, 1930 | A filed | | |
| Jan. 8, 1932 | | | B filed |
| Mar. 30, 1934 | | Intf. I declared, involving B (and others) | |
| Aug. 14, 1934 | A assigned to Bendix Products Corp. | | |
| Aug. 23, 1935 | Claims corr. to counts 1, 3 & 4 of Intf. VI allowed. Claims corr. to original claims 1, 2 & 3 of A2 allowed. | | |
| Apr. 8, 1935 | | | C filed |
| Apr. 9, 1935 | | | C assigned to Gen. Motors Corp. |
| Sept. 24, 1935 | | A added to Intf. I. Intfs. II, III, IV declared, each involving A (and other applications). | |
| Oct. 13, 1936 | | Examiner's decision in Intf. IV dissolving intf. on ground Shaff had no right to make the counts. | |
| Dec. 31, 1936 | | Examiner's decision in Intf. I dissolving intf. on ground of unpatentability of counts. | |
| Jan. 7, 1937 | | Examiner's decision in Intf. II dissolving intf. on ground of unpatentability of counts. | |

| DATE | SHAFF APPLICATION | INTERFERENCES | JORGENSENS APPLICATION |
|---|---|---|---|
| May 21, 1937 | | Examiner's decision in Intf. III dissolving intf. on ground of unpatentability of count. | |
| July 30, 1937 | | | Agreement to assign B to Gen. Motors Corp. |
| June 9, 1938 | A2 filed as a cont. of A. | | |
| Apr. 23, 1939 | | Intf. V declared between claims in A and B. | |
| May 8, 1940 | | Examiner's decision in Intf. V dissolving intf. on ground Jorgensens were estopped. | |
| Dec. 17, 1940 | | | C issued as patent No. 2,225,261 |
| May 27, 1941 | | Intf. VII declared between claims in A2 and C1 | |
| Mar. 24, 1942 | | Examiner's decision in Intf. VII denying Jorgensen's motion to dissolve. | |
| Dec. 26, 1944 | A issued as patent No. 2,365,910 | | |
| Oct. 31, 1945 | | Decision of Bd. of Intf. Ex. in Intf. VII awarding priority to Shaff. | |

| DATE | SHAFF APPLI-CATION | INTERFER-ENCES | JORGENSENS APPLICATION |
|---|---|---|---|
| May 2, 1947 | | Intf. VI declared between claims in A and B | |
| June 11, 1947 | | | B assigned to General Motors Corp. |
| July 19, 1948 | | Decision of Commissioner deferring consideration of estoppel against Jorgensens to final hearing in Intf. VI. | |
| Apr. 3, 1951 | | Decision of Court of Customs and Patent Appeals in Intf. VII affirming Bd. of Intf. Ex. | |
| Aug. 21, 1951 | | Decision of Board of Intf. Ex. in Intf. VI holding Jorgensens estopped to contest priority and awarding priority to Shaff. | |
| May 27, 1952 | A2 issued as Patent No. 2,598,450 | | |